JOHNSTONE v. FURNESS, WITHY & CO., Limited, et al.

(District Court, S. D. New York. October 11, 1909.)

SHIPPING (§ 132*)—INJURY TO CARGO—NEGLIGENCE IN LOADING.

Damage to cotton on a lighter in the harbor of Savannah, Georgia. Held that the damage was due to water being pumped on the lighter by the steamer Dalton Hall, belonging to Furness, Withy & Co., and that there was no fault on the part of the Atlantic Coast Line Railroad Company.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 484; Dec. Dig. § 132.*]

(Syllabus by the Judge.)

Action by Frederick F. Johnstone against Furness, Withy & Co., Limited, and the Atlantic Coast Line Railroad Company. Decree against Furness, Withy & Co., Limited. Petition against railroad company dismissed.

Kneeland & Harison, for libellant.
Convers & Kirlin, for Furness, Withy & Co.
Stewart & Shearer, for Atlantic Coast Line R. Co.

ADAMS, District Judge. This action was brought by Frederick F. Johnstone against Furness, Withy & Co., Limited, to recover the damage, said to amount to $2,069.93, caused by the wetting of 155 bales of a shipment of 200 bales of cotton, while on the lighter No. 23 in the harbor of Savannah, Georgia, on the 17th of October, 1904. The allegations are that Johnstone shipped the cotton on a through bill of lading to Genoa, Italy, from Montgomery, Alabama, and while on the said lighter in the harbor of Savannah on the said day, in readiness for shipment on the respondent's steamer Dalton Hall, the lighter sank through unseaworthiness, causing the damage.

Furness, Withy & Company brought into the action the Atlantic Coast Line Railroad Company, alleging that the lighter was taken alongside of the Dalton Hall on October 15th by a tug employed by the Railroad Company and remained moored as she was left by such tug, no cargo having been removed and that no work was done in loading the steamer on the night of October 15th or on Sunday, October 16th. It was further alleged that during the nights of those days, pursuant to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the laws and regulations of the port, the crew of the steamship were compelled to go ashore at 6 p. m. and remain during the night; that on Monday, the 17th, when the officers of the steamer arrived on board to proceed with her loading, it was found that the lighter had sunk alongside the steamer and the cotton in question was floating in the water or had drifted ashore; that the damage was not due to any fault of the steamer but was owing to the unfit and unseaworthy condition of the lighter, or to the improper loading or overloading of the lighter by the agents of the Railroad Company or to some neglect or default of the same; that the cotton at the time of the damage was in the custody of the Atlantic Company and not in the custody of the Dalton Hall; that the negligence to which the damage was due was the act of that company, and it would be in the furtherance of justice to bring it into the action.

The Atlantic Company filed its answer to the petition, in which it was alleged, after some denials and admissions:

"On September 26th, 1904, the respondent received from F. F. Johnstone & Company at Montgomery, Alabama, 200 bales round lap cotton, for which it issued and delivered to said Johnstone & Company the through bill of lading hereinbefore mentioned, whereby, among other things, it was agreed that said cotton should be 'carried to the port of Savannah, Georgia, and thence by S. S. Glenwood to the port (B) of (Genoa, Italy) * * * and to be there delivered in like good order and condition on * * * (to the order of F. F. Johnstone & Company), or to consignee's assigns, or to another carrier on the route to destination, if consigned beyond said port (B), upon payment, immediately on discharge of the property, of the freight from Montgomery to Genoa, Italy, of 63 cents, United States gold currency, per 100 pounds gross weight * * * Inland............................................38
                                                   Ocean ...............................................25
                                                                                                        ——
                                                                                                        63

Said bill of lading contained the following provisions, among others:
'The carrier shall have the liberty to * * * lighter * * * and to load and discharge goods at any time.'
Further
'3. No carrier shall be liable for any loss or damage not occurring on its portion of the route, nor after said property is ready for delivery to the next carrier.'
'13. This contract is executed and accomplished, and all liability hereunder terminates, upon delivery of said property to the exporting steamer, her master, agent or servants, or to the exporting steamship company, or on the pier usually used by the exporting steamer at the said port (Savannah), whether or not the same may be the property of or used as a warehouse by the inland carrier also. * * *'
When said cotton reached Savannah in the regular course of transportation the respondent received instructions from Strachan & Company, agents of Furness, Withy & Company, Limited, to have the libellant's shipment of 200 bales delivered to the steamship Dalton Hall. Pursuant to such instructions, the respondent, which had no lighters of its own at this port for carrying cotton, unloaded the said 200 bales on the end of its wharf and delivered the same into the hands of Savannah Lighterage & Transfer Company to be conveyed as it saw fit to said Steamship Dalton Hall pursuant to the contract between the said Savannah Lighterage & Transfer Company and the respondent as aforesaid.
The agents and servants of said Savannah Lighterage and Transfer Company loaded the said 200 bales of cotton together with 102 other bales on board lighter No. 23 which was either owned or rented by them and said lighter was then towed alongside the steamship Dalton Hall on the afternoon of Friday, October 14th, 1904, on which date the mate of said steamship duly

receipted for said cotton. The next morning the discharge of said lighter into said steamship was begun. During the day 102 square bales of cotton were discharged from the lighter and taken on board the steamship, together with 45 bales of the Johnstone shipment, leaving 155 bales still on board the lighter.

On October 15th, 1904, the master of said steamship executed and delivered to the respondent a receipt for said 200 bales as set forth in the sixth article of the libel.

The discharge of said lighter was exclusively under the control and management of the steamship Dalton Hall and the agents of Furness, Withy & Company, Limited, who as the respondent is informed, so negligently and improperly discharged the cargo of said lighter that during the night of October 16th–17th, 1904, she sank.

Said lighter was tight, staunch, and strong, and in all respects seaworthy. She did not spring a leak and her sinking was due solely to the negligence of those in charge of the steamship Dalton Hall, in that they did not unload her with care and skill, but instead allowed a portion of her cargo to remain at one end of the lighter, which put her by the head or by the stern, so that she took in water over her decks and thus filled and sank. Said lighter was afterwards raised and put into service and continued in service for many months without repairs of any kind.

Whatever loss or damage was sustained by the libellant was due solely to the negligence of the respondent Furness, Withy & Company, Limited, and those in charge of the steamship Dalton Hall."

On the trial an amendment was asked for, as follows:

"And further, in that they negligently allowed a stream of water from the steamship's pumps to flow on to the lighter on the morning of October 17 thus causing the lighter to sink."

The proposed amendment was strenuously objected to by Furness, Withy & Co., but after consideration, I have concluded to permit it. The only substantial effect is to make the pleadings conform to the proof, which was properly received in replying to a general allegation of negligence and simply gave particulars. I have also allowed a proposed amendment of the libellant not hereinbefore alluded to. It only serves the same purpose.

The testimony shows that the lighter arrived alongside of the steamer on the 14th of October, about 7 or 7:30 P. M. Upon arrival, or shortly thereafter, the 200 bales were receipted for by the mate of the steamer. On the next day, the 15th, the master signed a receipt for 200 bales. These were round bales. There were also 102 square bales loaded on the lighter. At the time of delivery all of the crew were on shore and the ship in charge of a watchman. On the 14th, 45 bales of the 200 were removed from the lighter to the steamer. The cotton was loaded on the lighter in the usual and customary manner. The quantity was not in excess of her safe capacity. She was all right up to 5 o'clock Monday morning as seen by the watchman who had examined her three times during the night. She was found to be sinking at ¼ before 6 o'clock.

There can be little doubt of the lighter's seaworthiness. After this occurrence, she was pumped out, repaired at an expense of $28 and put to work again and continued working, carrying full loads. Some other reason than unseaworthiness must be found for the sinking.

It appears that water was pumped into her by the steamship between 5 and 7 o'clock Monday morning. Several credible witnesses said the flow was from the ship's discharge pipe. She was moored on

the port side, opposite some discharge pipes of the steamer. These pipes were situated about amidships of the engine a little abaft the middle of the ship. The lighter was 65 feet long. The steamer was 337 feet long on the water's line, her water ballast tanks occupying the first 21 feet; hold No. 1, 60 feet; hold No. 2, 72 feet; the engine and boiler room, 56 feet; hold No. 3, 58 feet; hold No. 4, 54 feet, and the water ballast tank the remaining 16 feet. This would bring the lighter under the discharge pipes. Several witnesses saw a 5 inch stream of water coming out of the pipe, early Monday morning, which struck the deck of the lighter a little forward of a hatch. It was testified that a stream of this size would fill the lighter in from 15 to 20 minutes.

The steamer's crew had taken possession of the lighter, moved her at their pleasure, put tarpaulins over the cotton, and some time Saturday, the 15th, removed from her 45 bales. In connection with the receipt given, there can be no doubt that the steamer was in full charge. In view of these facts, the burden was upon her to show that the sinking and the damage to the cotton was due to some act not under its control. The owner has accepted this burden but has failed to show that the cause of the sinking was due to any act for which it is not itself responsible.

There will be a decree for the libellant against Furness, Withy & Company, with an order of reference. The petition against the Railroad Company is dismissed.